THE STATE OF NEW JERSEY, PROSECUTOR, v. NICHOLAS P. WEDIN.

Argued November 5, 1913—Decided February 16, 1914.

The acts of May 16th, 1894, and May 25th, 1894 (*Pamph. L. pp.* 378, 534), provide that the sheriff of any county who has taken over the custody of the jail thereof and the keeping of the prisoners therein "shall be responsible for the conduct of any keeper whom he shall appoint for the same." *Held,* that in the case of a sheriff charged criminally with a negligent escape the effect of this act is to add to that offence as it existed at common law the additional element that such negligence must be that of a person appointed by such sheriff within the meaning of such acts. *Held, also,* that in view of the acts in question the mere fact of a negligent escape from the county jail does not raise the presumption that the sheriff of such county has been guilty of a criminal offence.

---

On *certiorari.*

Nicholas P. Wedin, sheriff of the county of Hudson, was charged before a magistrate with negligent escape and, having waived indictment and trial by jury, was placed upon trial before a Court of Special Sessions upon a written accusation by the prosecutor of the pleas that the said sheriff did unlawfully and negligently suffer and permit certain prisoners in his custody in the common jail to escape therefrom.

At the close of the trial the court, while unable to find actual negligence on the part of the defendant, reached the conclusion that under the common law the escape of prisoners from the sheriff's custody rendered him guilty of the criminal

offence with which he was charged, but the court was unwilling to pronounce judgment upon this finding without the advice of this court upon the following questions:

*First.* Whether, if a prisoner lawfully committed to and confined in the county jail on a criminal charge escaped, and nothing further appear, the sheriff is indictable for a negligent escape.

*Second.* Whether, if a prisoner lawfully committed to and confined in the county jail on a criminal charge escaped through the negligence of the warden, jailer or keeper, the sheriff is indictable for a negligent escape.

*Third.* Whether, if a prisoner lawfully committed to and confined in the county jail on a criminal charge escaped, the sheriff may lawfully be convicted of a negligent escape, not occasioned in any degree by his actual negligence.

*Fourth.* Whether, if a prisoner lawfully committed to and confined in the county jail on a criminal charge escaped, the burden of proving actual negligence is on the state.

*Fifth.* Whether, to justify a conviction, the actual negligence of the sheriff must be established. If so, whether it must be established beyond reasonable doubt.

*Sixth.* Whether, upon the whole case as presented, the Court of Special Sessions should proceed to judgment.

*Seventh.* What is the effect, if any, of the adoption of the Civil Service act by Hudson county on the liability of the sheriff of such county for a negligent escape?

Before Justices GARRISON, TRENCHARD and MINTURN.

For the state, *Robert S. Hudspeth.*

For the defendant, *Joseph M. Noonan.*

The opinion of the court was delivered by

GARRISON, J. On April 19th, 1913, three prisoners made their escape from the Hudson county jail through a window that opened out of an air space above the ceiling of a bathroom, access to which was gained from the bathroom by

forcing a wire hatch in the iron latticework, which, together with a canvas covering, constituted the ceiling of the bath-room. The window in the air space was protected by iron bars, two of which were sawed away. While preparing for and executing their escape the prisoners eluded the vigilance of their keepers by the co-operation of a "trusty," and pos-sibly by the negligent performance by the keepers of the duties prescribed by the defendant.

Shortly before this the warden, who had been appointed by the defendant's predecessor and whom the defendant when he took office in 1911 summarily dismissed, was reinstated by the decision of the Court of Errors and Appeals in the case of *Sullivan* v. *McOsker*, 55 *Vroom* 380. By force of this de-cision all deputies and assistants selected by sheriffs under the act of 1905 (*Pamph. L., p.* 18) were held to be the servants of the board of freeholders. Under this decision McOsker, who had been appointed warden by the defendant, went out of office on March 18th, 1913, when Sullivan, the old warden, became such both *de jure* and *de facto*. This was the legal situation at the time the escape occurred, although at that time Sullivan, being under charges, was not acting as warden. All other assistants about the jail were, under the decision cited, employes of the county and not of the sheriff. Under these circumstances the defendant, as sheriff, was charged with and tried for a negligent escape as an offence for which he was criminally responsible. The question is whether, upon the facts found by the Special Sessions, the defendant is guilty of the crime with which he stands charged.

This crime is of common law origin, and hence to the com-mon law we must look for its definition.

Despite the admirable industry displayed by counsel for the defendant in his review and criticism of the ancient reports, we think that the common law definition of negligent escape is correctly stated in 2 *Russ.* (at *p.* 420), viz.: "A negligent escape is where the party arrested or imprisoned escapes against the will of him that arrests or imprisons him, and is not freshly pursued and taken again before he has been lost sight of. And from the instances of this offence mentioned

in the books, it seems that where a party so escapes the law will presume negligence in the officer."

This definition, which was approved by Chief Justice Beasley (*obiter*, it is true), in *State* v. *Errickson, 3 Vroom* 421, was adopted by the court below as the basis of its finding that the defendant was guilty of a misdemeanor which, since March 18th, 1796, has been on our statute books. *Rev.* 1821, *p.* 256, § 47. This ancient statute is now section 8 of the Crimes act. *Pamph. L.* 1898, *p.* 796.

The harshness of making one man criminally responsible for the conduct of another, *i. e.*, the sheriff for the negligence of his assistants, which is extenuated by common law writers on the ground of necessity, is uniformly palliated by them upon the theory that such assistants are the personal appointees of the sheriff and removable at his pleasure. This excuse, however, although put forward by judges and text-writers as the reason for the common law, is no part of the common law which, as quoted from Russell, is that a presumption of guilt arises from the fact of an escape.

To remedy this discrepancy by making the law conform to what both judges and commentators agreed was its spirit and reason, the legislature of this state, in 1894, enacted two statutes vesting the custody of county jails in the sheriffs and declaring the measure of responsibility that would be thereby incurred. The custody of the jails had been in many cases vested in boards of freeholders; in the counties of Hudson and Essex this had been done by the act of February 27th, 1857. To restore the jails to the custody of the sheriffs, or at least to tender such a restoration (for it was not compulsory), was the main object of these statutes, the first of which was an amendment to the act concerning sheriffs, and applied generally to all counties (*Pamph. L.* 1894, *p.* 378); the other was an independent act "to regulate the custody of jails and prisoners therein in counties of the first class in this state." *Pamph. L.* 1894, *p.* 534.

As this latter act is the one that specifically applies to the case in hand, I will quote its pertinent provisions in full, although the italicized language is identically the same in the earlier act which applies to all counties in the state:

"1. The sheriff in all counties of the first class in this state shall have the custody, rule, keeping and charge of the jail or jails within such county and of the prisoners in such jail or jails, *and shall be responsible for the conduct of any keeper whom he shall appoint for the same.*"

"2. Upon the sheriff in any county of the first class taking the custody, rule, keeping and charge of the jail or jails affected by the provisions of this act, the term of office of any jailer, warden or keeper theretofore appointed or elected in any way whatever shall immediately cease and terminate; and the authority of the board of chosen freeholders of such county to appoint a jailer, warden or keeper of such jail or jails shall be suspended so long as such sheriff shall keep the custody thereof and of the prisoners therein."

Section 3 provides for the turning over of the custody of jails by the sheriff to the board of freeholders, and section 4 is a general repealer.

If it were not the legislative purpose to change the old law in some respect, a simple repealer of the act of 1857 would have accomplished all that was intended; the intention to change the law and the nature of such change are both clearly expressed.

Indeed, the language of this act is so plain that two interpretations of its meaning are not possible. The act clearly deals with the custody of prisoners in the general criminal sense and not merely with the altogether exceptional case of defendants held for bail in civil actions, with respect to whom the law as to escapes was entirely settled upon a footing that involved no hardship to the sheriff. Equally clear is the intention to limit the responsibility of the sheriff to the conduct of keepers holding office under his appointment, else these significant and innovating words go for naught. Whether intentionally so or not, the act holds out this change of responsibility as an inducement to sheriffs to take over the custody of the jails in reliance upon the plain declaration of the legislature as to the measure of the vicarious responsibility they would thereby assume. In effect, therefore, such legislative declaration was a modification of the common law

in so far as it bore upon the responsibility of sheriffs with respect to the conduct of keepers in charge of the prisoners in the common jail—that is to say, a modification of the law of negligent escapes. I can reach no other conclusion than that by this statutory language the common law as to negligent escapes was so modified that in order to constitute the offence it must appear not only that an escape occurred from the negligent conduct of a keeper, but also that such keeper was an appointee of the sheriff within the meaning of this statute, which is just what the offence always was in fact at common law and in this state also until the passage of our Salary act of 1905.

I am not, of course, suggesting that the legislature foresaw the passage of that act or anticipated the effect to be given to it upon the passage of the Civil Service act; it is enough that in remedying a defect in the common law a change was effected without which the effect given to these newer statutes would be quite intolerable. The position of the sheriff was sufficiently precarious at common law when he was held responsible for the conduct of those who were bound to him by every tie of self-interest and loyalty; his position would be quite intolerable if he were in constant danger of criminal indictment for the conduct of those whom he did not trust or desire to retain in his service or whose hostility he had perhaps incurred by actual dismissal. For, if a person thus dismissed may be reinstated and kept in place by *vis major,* the position of the sheriff is perilous indeed, since his criminal conviction is at the mercy of servants whom he has deeply offended and yet whom he must retain in his service. If the law had not already been changed it would have to be changed now to meet this condition. So, while the change was probably not made with any such prophetic foresight, it is a most beneficial one and fits in exactly with existing conditions.

It is no answer to say that the sheriff may rid himself of the custody of the jail; the question is not of what responsibilities the sheriff may rid himself, but what responsibility he incurs if he accepts a statutory duty according to its express terms.

We have sufficiently indicated that in our opinion the effect of the statute is precisely as if its declaration as to the responsibility of the sheriff were added as a proviso to Russell's definition of negligent escapes. The fact that such proviso is not in the "Crimes" act is insignificant if under a constitutional title the legislative intent has been expressed. This was ruled in the Court of Errors and Appeals in *State* v. *Twining,* 44 *Vroom* 683, and a long list of such enactments is given in the opinion of the Supreme Court. *State* v. *Twining, Id.* 3.

In the present case, the legislation was enacted under two different titles, to each of which it was germane; a circumstance from which it would be difficult to argue that the lawmaker did not intend that what it said should become the law, if such an argument is ever an admissible one.

For obvious reasons the court below, in the present case, made no finding of fact upon which judgment can be pronounced under the common law as thus modified by the legislature; and it is questionable whether such a finding is possible in view of the legal *status* of the sheriff's assistants as determined by the decision in Sullivan *v.* McOsker.

For present purposes it is enough that no such finding is before us on this record.

This being so, our answer to the sixth question is in the negative, leaving the other questions propounded to be either answered by what has been said or left unanswered because of what has been said, as the case may be.